The next case of the day, and that is Shimana. And we'll hear from Mr. Stris. Thank you, Your Honor, and may it please the Court. Peter Stris of Stris & Maher, on behalf of Defendant Appellant Patrick Nguyen. Your Honors, it is a bedrock principle of ERISA that courts do not override a plan's interpretation by its administrator unless that interpretation is arbitrary. In this case, the API plan administrator formally interpreted relevant provisions in two key plan documents. Accepting the administrator's interpretation of either document would require complete dismissal of this lawsuit. The District Court, purporting to give Firestone deference, nonetheless rejected the administrator's reasonable interpretations in favor of Plaintiff Humana's contrary reading. And we submit today, Your Honors, that this is every bit as backwards as it sounds.  And with permission, I'd like to turn to the first, which is the notion that Humana does not have authority as a fiduciary to bring this lawsuit. Humana's position, which was accepted by the District Court, is that in a document called the Plan Management Agreement, and this is in the Record on Appeal, pages 724 to 756. I mention that because I'm going to be talking about a number of provisions in that contract. Humana's position is that in that contract, API granted Humana discretion to make benefit determinations in the first instance, and that claim appears on page 1, front and center of the red brief. And it's also Humana's position that this document gave Humana discretion to determine who and when to sue for reimbursement, and that claim appears on page 6 of the red brief. You know, I don't understand what's going on here, because you are suing against the wishes of Humana. Well, I represent the defendant, Patrick Wynn, and so he has been sued by Humana, the third-party administrator of the plan, against the wishes of the plan administrator of the plan. Maybe I should ask them what's going on. Yeah, it actually is very confusing, but I think the best way to take it apart is to actually look at the plan management agreement itself. Let's take a look. What's not confusing that's overarching in connection with Judge Jolly's statement is that the employee of the CEO of your client's company is trying to allow him to double-dip after hiring and paying Humana as the insurance company to provide this policy to cover the employees for health services. And so, I mean, that's what the case is about. Well, with respect, Judge Wiener, that certainly is the elephant in the room, but I would disagree with that characterization on two levels. First, firestone deference is a bedrock principle of ERISA, and so when the plan administrator of this plan takes a position on what the meaning... The plan administrator has already said that the plan manager will provide subrogation recovery services for identifying and obtaining recovery claims payments from all appropriate parties through operation of subrogation or recovery provisions of the plan. Now, the plan and the plan administrator, Ms. Miguel or whatever her name was, have in this document given discretionary authority and made a fiduciary for those purposes out of Humana, even if they're not in other. Okay, so I was going to get to that, but before I do, I really want to start with what the standard of review is, because as you stated, Judge Clement, in Atkins very recently, absent... And I'm quoting, "...absent potential wholesale or flagrant violations that evidence an utter disregard of the underlying purposes of the plan, this Court does not heighten the standard of review from abuse of discretion to de novo." Isn't counsel or the party opposite saying that's exactly what happened here? They're trying to provide double-dipping against the provisions of the PMA or the summary plan description. Certainly not. I want to get to that substantive claim, but let me start with Concrete and what the U.S. held there. To my disappointment, having unsuccessfully argued that case, the Chief Justice made it very clear that firestone deference applies absent a factual finding that the plan administrator, and I'm going to quote, "...acted in bad faith or would not fairly exercise his discretion to interpret the terms of the plan." And if you permit me a moment, that makes common sense, because if you think about this from a broad level, in the mine run of ERISA cases, you have plaintiffs that are challenging benefit denials by financially interested administrators. So if you didn't have a factual finding that said, oh, the conflict of interest in this case actually affected what occurred. There's bad faith. There's reason to believe that we don't trust the plan administrator. If you don't have a finding like that, then you've done nothing short of declaring open season on firestone by dissatisfied plaintiffs and their attorneys. So I think the standard of review here is very clear, and frankly, Judge Wiener, I think the district court understood this, because if you look at the district court's holding, the district court judge never once says, well, there's a conflict, and so I'm not going to afford firestone deference. The district court judge says I'm going to afford firestone deference, but the plan administrator's interpretation is patently wrong. And so with that, I'd like to answer the other half of your question, which is this notion of double-dipping and who gets to decide. So let's take a look at the plan management agreement, because I think it's from the nature of your question, you've kind of accepted the factual characterization of my friend Mr. Lawrence, and I just think it's wrong. So if we look at paragraph 5.1 of the plan management agreement, this is page 727 of the record on appeal, this is the paragraph that my friend cites, and it states, the client hereby delegates to the plan manager authority to make determinations on behalf of the client or the plan administrator with respect to benefit payments under the plan. So far, so good. Sounds very good for them. It sounds like there's a delegation of discretion. What my friend cite opposite fails to mention, mention, cite, discuss, is paragraph 5.6 of the contract on the very next page. And I'd like to read this to you because the principle that it embodies explains the fundamental problem with the premise, I believe, of your question, Your Honor. And here's what it states. It says, however, if the plan administrator makes a determination to approve or deny a claim which is different than the determination made by the plan manager, the plan manager will, and to paraphrase, do what the plan administrator says. This doesn't involve a denial of a claim. This is subrogation to recover what's already been paid by a third party. But they're flip sides of the same thing, and I'm going to get to section 7.5 in a minute, but I wanted to read this because this fuzzy way of thinking pervades the entire red brief. If you look at page 1 of the red brief, my friend cite opposite tells you that Humana has discretion to make benefit determinations. That's not true. The broad principle that animates this agreement is that the plan administrator makes all final decisions. And that comes from article 2, which is on page 725 of the record on appeal, which is entitled Relationship Between the Parties. If you look at this part of the contract, and you have to when we go look at section 7.5, look at that in context. So the contract begins with article 2, which explains by its title the relationship of the parties. And every subsection of this article disclaims Humana's fiduciary status directly tracking the magic language of ERISA and the relevant cases. And I would point your attention to paragraph 2.2. It's on page 725 of the record on appeal. Except as may otherwise be expressed. I'm absolutely going to get there, but I really think it's important to take it piece by piece so that we have the appropriate context. Before we get to the exception, let's look at the rule. The rule is, and I quote, the plan manager does not have discretionary authority or responsibility in the administration of the plan. That's the default, and that precisely disclaims the definition of fiduciary status in 29 U.S.C. 100221A, which Humana needs in order to have standing to bring this case. Okay, now to your point. We look at the next paragraph. And it says... It says that the plan manager is not a fiduciary except as may otherwise be expressly provided herein. Now, why have I taken us on this relatively boring odyssey? I've done this because we have two background principles that we need to keep in mind when we now turn to paragraph 7.5, which appears to trouble you, Your Honor. The two background principles are, number one, the default under this contract is that Humana is not a fiduciary, is that Humana, if they're ever in a dispute with API, API gets to make the final decision. That's the default. Even if we were using de novo review, we would only overcome that default if there was a provision that, to use the language here, expressly provided otherwise. That's background principle one. Background principle two, as the district court recognized, and as this court has said time and time again, and the Supreme Court said in Firestone and then again in Glenn and then again in Conkright, we have Firestone deference. So in order to get reversal here, I don't have to establish under a de novo standard that there's not an express provision authorizing Humana. I just have to show that the plan administrator's position that there is not express authorization is reasonable. So with that in mind, let's take... Is it reasonable to say that the plan manager will provide subrogation recovery services in addition to routine for identifying and obtaining recovery claims payments from all appropriate parties, etc., and say that that's not an express exception? I think it absolutely is not, and let me take you through our position. Because I think even under a de novo standard we should prevail, but with Firestone deference, I actually think this is a very easy case. So the plan administrator from now on has to deny all subrogation recovery. If she can do it for the CEO's son, she has to do it for everybody. Absolutely, and that is critical to our argument. And what insurance company in its right mind would provide this kind of health... It's funny that you say that, because I would say two things. First, I would say the plan administrator's position is that you don't get subrogation and reimbursement against uninsured motorist claims. As someone who litigates these cases very often, I tell you that's a very small piece, and I do not think it would affect... Why would that be an exception, even though it's a small piece? Well, there's many policy arguments. If we were going to talk about why you would craft subrogation provisions one way, why you would have a common fund exception, why you would have a make-all exception, there's literature that's existed in the 50 states for decades, and no state does it the same. So that's my first answer. But let me give you my second answer, which is just basic law and economics, which I think is more important. We're going to give you two more minutes, so you don't have to just run through. I know you've got some points you wanted to make. I appreciate it. That was your very polite way of saying that I was speaking quickly and in a frenzied way. No, I'm asking too many questions. No, you're not asking too many questions. You can ask as many as you want to, but we won't get full answers. I appreciate that very much, Your Honor. So to the economic answer, because I think it's a very good question, but I think we have a very good answer, which is if you look at each document in this case, the plan management agreement, the new case document, all of them say the following. They say if the administrative costs here turn out to be higher or lower than what we expect, the parties are going to have to renegotiate the pricing. That's how these things work. It's not just subrogation. If your fear were right about subrogation, I would say your argument proves too much, and here's why. For every subrogation claim involving uninsured motorist coverage, which is a minor event, there's many benefit claims, right? And you asked me earlier, well, but this case isn't about benefits. But it is, and here's why. If we look at the language which clearly says that if there's a dispute, the plan administrator every time gets to decide whether we're going to grant or deny benefits, I could throw the same question back at the panel and say, why would any insurance company in their right mind want to insure this as a stop-loss carrier? And the answer is, you have history. You make decisions based upon your actuarial assumptions, and if it turns out that it's not attractive, you change. These are year-to-year contracts, and I think we firmly have law and economics on our side. So back to the core issue, since I have the time. Let me ask you a question. Is there any evidence in the record that before this incident, before the filing of this attempt at reimbursement subrogation, was there ever an active supervision by API of Humana? In other words, does Humana have to get permission to file... I understand the question. ...DVS lawsuits? I understand the question. That would be a yes or no, and then you... Yeah, I was just going to say, I understand the question. The short answer is there is no evidence in the record, but I want to give you my slightly longer answer because I think pregnant in that question is an assumption that worries me, which is whose burden of proof it is. And as we explain on pages 6 and 7 of the reply brief, and I really want to make this clear, and we cite Gwaltney, it's a 1987 Supreme Court case, directly on point. Proving standing to bring a 502A3 claim is the plaintiff's burden. So the fact that there's no evidence, I think that weighs heavily in our favor. Humana has not attempted to prove that there's a history of them behaving in the way you describe. In other words, it would be very easy, if it were true, for Humana to come forward and say, we've been doing this for two years, never before has anyone complained. Every time, we get to make the decisions, not a shred of evidence. And in fact, the only evidence in the record is the contrary statement. There's no factual evidence, but it's the contrary statement of the plan administrator. And, you know, this is... This is the record on appeal, pages 579 to 582, and the relevant paragraphs are paragraphs 6 and 7. She says, we make the decision, Humana executes. And so you have to remember, this is summary judgment as a matter of law granted to Humana when they have the burden to establish that they are, in fact, a fiduciary. So with the final 30 seconds, I want to just close the loop on paragraph 7.5, because I think this is very important. If you look at the language that's listed here, it directly mirrors, almost to a word, the relevant DOL regulation of ministerial non-fiduciary functions. So I, as someone who litigates these cases a lot, I find it ironic that Humana is relying on this language, which has been adjudged by the government to be purely executing language and claim that it somehow confers discretion. It doesn't say Humana gets to decide. If you look at paragraph 7.5b1, it says Humana investigates. And so I see my time is up, and so I appreciate the indulgence. Thank you, Mr. Stress. Mr. Howard, we'll hear from you. Thank you. May it please the court. My name is Gordon Howard, and I, along with my co-counsel, Mr. Thomas Lawrence, represent Humana Health Plan, Inc., in this case. I'll be addressing the reasons recently discussed by the appellant regarding Humana's role as a fiduciary with respect to segregation recoveries under the API plan. And Mr. Lawrence will be addressing the other issue raised in the briefs, which is whether the summary plan description is a governing plan document here conferring a right of reimbursement in this case. And I had reserved 8 minutes of time to present my argument, and Mr. Lawrence had reserved the remaining available time to present his argument. But to begin with, we believe Humana is a fiduciary because the plan management agreement vests Humana with discretionary control over segregation recoveries. And even if the court agrees with the appellant that Humana does not have final discretion or control over segregation recoveries, it's still a fiduciary if it possesses some discretion in determining which claims need to be referred to the plan administration for review and determination. Or the court finds that Humana has any control over the plan assets in this case. Okay, now, I want to ask somebody what's going on here. Why are you seeking this reimbursement or segregation rights when the plan, apparently, or some obligation on the part of ACI not to seek segregation against its covered employees? Well, Humana was vested, in our view, with discretion to determine when to pursue segregation recoveries. Why are you going to get it? Did you pay the money? Is that your money that you paid? Humana paid a portion of the money. There is a $65,000 retention under the stop-loss policy, and there's two years of coverage here that are at issue. So the plan was responsible for approximately $130,000 of the benefits payments, whereas Humana was responsible for approximately $147,000. Who paid the rest of it? Humana paid the $147,000 under the terms of the stop-loss policy. But who's going to get the money from this segregation? The plan will get approximately $130,000, and Humana will get approximately $145,000. But the plan, do I understand that the plan doesn't want the money? That's correct. Why in the world is this going on? And the plan is your client. Humana's belief is that the reason the plan has suddenly decided to be so involved in reimbursement segregation decisions is a direct result of the participant at issue being the son of the CEO of the company, and that Humana has always, we represent Humana in a number of cases, and they always maintain discretion and control over segregation recovery efforts. All right, but how does this affect your relations with your client? Well, Your Honor, that's beyond the scope of our representation. Act in contrary to the wishes of your client when you don't have a significant economic motive beyond that. I just don't understand. Well, Your Honor, I would suggest... Well, I don't understand. I apologize for stepping over you. No, no, no, I'm not faulting anybody. I'm just trying to understand. I would suggest that the reason that we did pursue this action is that we have a fiduciary obligation to all beneficiaries of the plan to ensure that the segregation recovery efforts are maintained in a way that is the same across the board. And we also have a fiduciary obligation to make sure that assets of the plan are protected in the future to protect benefits down the road for other plan participants. Every member of the plan, every covered employee of this plan, has the right to bring an action against a fiduciary for breach of that duty, doesn't it? Correct, Your Honor. And actually Section 3.11 of the Plan Management Agreement, which was cited by Mr. Nguyen's counsel, states that the client shall not act in a way that causes the plan manager to potentially breach a law or regulation or in a way that could implicate the plan manager in such a breach. And here, if Humana were not to pursue the segregation recovery, which it always has done in the past, at least in every case that we've handled for Humana, then it would be breaching that fiduciary duty to the other plan participants in favor of the CEO's son, which... Did you need permission from API to file these subrogation claims? I'm not aware of the specifics with respect to the API plan itself, but I do know that we handle these cases for Humana for a number of companies, and Humana is always the entity that pursues the subrogation reimbursement recovery. But you do not know the history with this particular client? I cannot truthfully answer yes or no. No, Your Honor, and I apologize for that. But, you know, and so I think that the key issue here is that even if Humana doesn't have final discretion or control, that it does maintain at least some control over the subrogation recoveries in this case. The issue here is not who gets to make the decision, but whether Humana, because of whatever rights it has, is a fiduciary and thus has standing. That's correct, Your Honor. And I would argue that under the holding, in this circuit you have Wright v. Lancaster, which part of the holding states that an entity is a fiduciary if it's delegated at least some discretionary authority. And then in a separate holding of the Ninth Circuit that was recently filed by the court earlier this week as a supplemental authority, which we discovered, IT Corporation v. General American Life Insurance Company, the Ninth Circuit held that a claims administrator who had to refer all contested claims to a plan administrator for final review was a fiduciary because they had to interpret the plan and exercise discretion in determining which claims needed to be sent to the plan administrator for review. And so in this case, at a bare minimum, Humana has responsibilities for investigating claims and making a determination under the plan terms whether there is a potential subrogation reimbursement recovery. And if it is, then even under Mr Wynn's analysis, which I do not agree with, I believe that Humana would still be a fiduciary because they have discretion and control over which claims need to be sent for review to the plan administrator, and thus they're a fiduciary. Give Mr Howard one more minute. Thank you, Your Honor. And finally, there's also the issue of whether or not Humana could also be a fiduciary in a third situation. So we've covered they have absolute discretion or control over subrogation recoveries. Two, they have some discretion or control over which claims are sent for review. And the third situation is that Humana has any control over plan assets. And in this case, I would argue that Humana does have control over plan assets because under Section 7.5 of the Plan Management Agreement, they have authority to file, prosecute legal proceedings, and they have authority over the collection of any payments for subrogation recoveries. And along with this authority is the authority to settle claims. So they do have control over plan assets with respect to subrogation recoveries. Another important concept that I think that... In this case, with respect to this particular client, the restraints on your discretion are far greater than they usually are? Well, I think that they're far greater in this particular scenario than they usually are. And I think the reason for that is because of the direct relationship with the CEO. Well, I mean, he didn't... All of these documents that limit your discretion in really significant... to a significant degree didn't arise just after this one case came up. No, Your Honor, but I think that the critical thing is that ERISA recognizes that there's different spheres of fiduciaries. If we... And I will not argue with you that there is a general disclaimer of general fiduciary obligations within this document. However, this document provides exceptions, which supports the ERISA... excuse me, fiduciary status in the ERISA arena, which allows for limited fiduciaries over specific functions. For instance, in health cost controls... Basically, that is your argument, is what Judge Wiener pointed out earlier, is that you do have discretion with respect to subrogation, and that justifies your bringing this suit as a fiduciary? That's correct, Your Honor. That's the bottom line. That is the bottom line with respect to fiduciary status. And this is supported by health cost controls v. Washington... I see I'm getting close to time... which is a Judge Posner decision, health cost controls v. Washington out of the Seventh Circuit, where the plan participant argued in that case that the subrogation recovery specialists did not have standing to pursue the subrogation rights. The Seventh Circuit held that that's not true because they had control over litigation, they had control over collections, and they also had control over how the funds would be received. All right. If you have other cases that you want to cite to support your position, you may submit them to the court in a 28-J letter with copies to the other side. Thank you, Your Honor. And we will hear from Mr. Lawrence now. Now, what is it you're going to address now, Mr. Lawrence? Thank you, Your Honor. I'm going to address which plan provisions apply, which plan, you know, what's a plan document, what's not a plan document in those issues. May it please the court. Is that going to include the summary plan description? Yes, Your Honor. May it please the court. You'll identify which documents the court relied on. I will. I will. The court below correctly held that the plan terms established an equitable lien against settlement funds received by Mr. Nguyen. On pages 19 and 22 of the court's opinion, the court below correctly held that the Supreme Court's decision in Cigna v. Amara does not disturb prior holdings by this court that ambiguous plan language be given a meaning as close as possible to what was said in the SPD. But the court held that here, responsible appropriate party in the new case document which appellant contends is a plan document, which we disagree with, but it's really just an intake form, is not ambiguous and does reach UIM coverage. The court alternatively held that even if the term were ambiguous, the 2009 and 2012 SPDs both specifically reach UIM recoveries and pursuant to this court's prior rulings, the SPDs in new case documents read together, assuming, again, the NCD is a plan document, establish that the plan has a right to recover against UIM monies. There are two additional reasons that the court below is correct with respect to the plan terms establishing an equitable lien against UIM coverage, but these points provide that the court need not consider the new case document but rather only need to consider the 2012 summary plan description which expressly provides for recovery against UIM recoveries. First, the new case documents, either one of them, both by their own terms, are questionnaires used to prepare SPDs and have no legal significance once the SPDs are delivered. In the record at page 572, Exhibit 2, subsection A states that the new case document will be used by Humana to draft the summary plan description for the plan and to administer benefits under the plan during the period prior to the delivery of a final summary plan description. And the reason this is important is because what the appellant contends is that this new case document... I'll ask you just a little bit about your conflict with your client again. I mean, at the time that you entered into this agreement to provide the services that you provide, the provision was in the agreement that there would be no segregation against payments of a third-party insurance with respect to the beneficiaries. Is that right? No, Your Honor, it doesn't say that. That was added to it? Well, no. It's actually... What it says, what the plan says is that it can recover... It says in the new case document that the plan can recover from, let's see, responsible appropriate parties. And so... When did this come in that there would be no segregation rights against an employee whose additional payment benefits came from his own insurance company? It doesn't. Even the new case document that the appellant contends is a plan document doesn't say that. What it says is it says that the plan can recover from a responsible appropriate party. Then the SPD says, the SPD explains and flushes that out more and says that that specifically includes an uninsured motorist carrier. Now, our position is that new case document is a checkbox intake form, and by its own terms, it merges into the SPD once the SPD is finalized because it says here that... Well, I read that already. The reason we know that... You say because it's in the SPD, the provision in the other document to which you referred is nullified because it does not appear in the SPD. Well, the provision of the intake questionnaire becomes of no force and effect once the SPD comes into existence. The provisions are in the SPD, so it's a null and void moot document. That's correct. It's consistent with what this court has said in... Excuse me for referring to my notes. What this court has said in Rohrer v. Raytheon, even assuming... I don't think there's a conflict. Even assuming that this new case document is a plan document and that there's no... And even if there were a conflict, even if the new case document specifically said you cannot recover from UIM monies, which it doesn't, the SPD, under this court's prior decisions, in decision of Rohrer v. Raytheon, 181F3634, would hold that what's in the SPD is going to control because that's what's delivered to participants. Is it accurate to say that as the ERISA law on plan documents has evolved, that as of today, the SPD is the plan? Absolutely, Your Honor. I've litigated this issue several times, once in the United Circuit in a case called Walmart v. Gamboa, and there the court noted that there's a lot of confusion over what is a plan. And so many people out there, even in this ERISA world, they tend to get confused and think that a plan is something because it says plan on it. But here... What is a new case document? Is that a requirement? Functionally, it's a... Well, what it says, it says the new case document will be used by Humana to draft the summary plan description. So it's essentially an intake questionnaire for the employer to say, this is what we want in our document. And so the other important... To whom is that directed? It's directed to the employer, to API. So they're directing Humana how to craft the new SPD. That's correct. And there's some clarity on this in the record at page 781. It's the second declaration of Brian Bargander. It's an attachment to that. It's called Claims Payment Agreement Summary Plan Description. This was an agreement between Humana and API that was executed before the settlement on January 9, 2013 that says actually that the agreement is effective retroactive to June 1, 2012. It doesn't really have any... There's no issue with that here because the settlement was after. And it's one of these... It's a pretty basic principle that the plan in effect at the time of the settlement is the plan that's going to control the rights and obligations of the parties. But what the section B of the agreement in the record at 781 says is that claims payment will be based on benefits and provisions. Two words are important here. Described in the new case document, but the but's my addition, as stated in the summary plan description. And that summary plan description was attached to this affidavit and is in the record in the case in the court below at 45-1. And I apologize that I don't have the record site for the court. But I know it's cited throughout the document. One point I want to make. At the time the district court issued its opinion, the district court kind of just went ahead and assumed for purposes of argument, of the appellant's argument, that well, look, even if these new case documents are planned documents, we don't have to get there because they're clear. There's no conflict. And the summary plan description doesn't... The summary plan description may flesh out what's said in the plan, but there's no conflict. But in any event, one of the important things that came out a couple months ago was a case out of the 11th Circuit called Board of Trustees v. Montanil, 2014 U.S. Appalachians 22438 at Star 17. That case has been provided to the court in a 28-J letter a couple of days ago, which talks about this whole notion. There have been a few cases on it. There have been some lawyers in the subrogation world who have argued that Cigna v. Amara means that an SPD can't be an SPD in the planned document. And several district court cases have come out since that case, and so that's just wrong. Well, finally, a couple months ago, the 11th Circuit came out and said, quote, the Amara court had no occasion to consider whether the terms of an SPD are enforceable where it is the only document that specifies the basis on which payments are made to the plan. And so the point being that that's not what the Supreme Court said. They didn't say that if the SPD is the document that's going to be the SPD in the planned document, that there's any problem with that when you're talking about this world of subrogation. And that's been in the case I handled in the 8th Circuit several years ago, the Walmart v. Gamboa case, very same issue. So I think had the district court had the benefit of this decision when it rendered its opinion, it probably would have just rejected those new, not even talked about that new case document, because if you look at it, you can see it's a questionnaire. And its terms itself say that all it's used for is to prepare the SPD. The SPD, the 2012 SPD, was in effect. The affidavit establishes it was in effect. If for some reason it wasn't in effect, well, the 2009 SPD was still in effect. That means it was still in effect. So I don't, when I look at this, when I look at this to prepare for my argument, I don't understand, frankly, what, it seems clear to me that the new case document is nothing but a questionnaire and really shouldn't even be talked about as a planned document. What are the planned documents? The SPD and the PMA? Well, I would... Or just the SPD? I mean, I would contend, I would contend that the planned documents that are going to be, I mean, I would contend that the PMA is a contract between Humana and the employer and that the terms of the plan are in the SPD alone. Beneficiaries of the ERISA plan are covered by the SPD. That's correct, Your Honor. That these other documents, I just don't, I don't traditionally think of those as the terms of the plan because they don't talk, they talk about rights and obligations as between Humana. The cases I've seen recently by plan participants, not the sponsor, depend on the SPD when they're making claims against the plan. Correct. I agree. If there are any other questions, I'm glad to answer them. Okay, thank you, Mr. Lawrence. Thank you, Your Honor. Mr. Scrish, you have some time for us. Thank you, Your Honor. I want to address three things that I think are very, very important. The first are some... Let me ask just one question. Do you agree that the bottom line of this case is whether they have, whether they are a fiduciary by virtue, in this case, by virtue of the subrogation provisions of the plan that give them the right to pursue subrogation claims? I would agree that we win on fiduciary status based upon the entire contract, not a particular provision. Well, okay. What I want to know, and I want the parties to submit a letter on it. I'm not taking your time on this. We'll give you a little more time. But... is, because that's what I was told, that the bottom line is that the authority for this lawsuit and standing in this lawsuit is the discretionary authority and the fiduciary relationship that arises from the subrogation clause in this agreement. I will certainly submit a letter. All right. And I want simultaneous letters on why that is true with case authority and, from your point, why it's not with case authority. Understood. Okay, and file that within, file that by 5 o'clock next Monday afternoon. Yes. Simultaneous letters, okay? No more than three pages, okay? Understood. It was one of the three things I was going to cover, so now I can address the other two. I apologize. I have one question with respect to the letter. Do you want that, is there a bond restriction in 14.1, just like... What? Is there a 14.1 bond restriction, which is typical... I don't care about that. Okay, start over. Start five minutes over. Okay, go ahead. Okay, so the two things, then, that I really want to discuss are a number of very significant practical concerns that you've raised, Judge Wiener, that I think were not on the same page and I'm hoping to get another chance. And then I want to discuss the significance of the SPD versus what we claim is the planned document. Let's take the practical concerns, because I think this is really the elephant in the room. I'm going to tell you right now as I stand here that it is very common to carve out uninsured motorists or underinsured motorist recoveries from subrogation provisions, and it's very important to understand why. It's common because almost by definition, when an uninsured or underinsured motorist coverage kicks in, it means there's only a little bit of a recovery. It means in most cases, like in this one, a catastrophically injured plaintiff is not going to be made whole. I'm not saying you have to do it, but I want you to appreciate practically that many plans make the precise decision that the API administrator claims they did here by carving out that recovery. That's the first practical point. On a case-by-case basis? Never, never. And that's the second thing I want to talk about, which is there's this obsession in the briefing in this case that my client is the son of the CEO. And it's astounding to me. I do not understand why this is relevant. This is a public company that has between 500 and 1,000 members in this plan. The decision that the API plan administrator made here is going to bind everyone. There's no evidence in the record, none, that this is different from the course of conduct between the parties in the past. And as I said earlier, Judge Clement, when you asked me, the burden is on them to put forward that evidence. Will we find that the reason to not go for subrogation was that the funds came from the underinsured motorist policy of the injured party? That's the position of the plan administrator. I believe it's correct. But was that communicated? Was that given? I have no idea. There's nothing in the record about anything extraneous to the documents when the parties negotiated this contract. But that wins the day. My point is, what's unique about underinsured motorists, if the people recover, whether it's tort or insurance or whatever, something the plan has already paid, then why deny subrogation? Oh, there's something very unique. I'm not saying you need to do it. Not very unique. Oh, that's true. I'm embarrassed, and I can't justify that. But it is unique. And what's unique about it is, we know by definition that the tortfeasor has no money. Tortfeasor has what? Tortfeasor is judgment-proof. The tortfeasor plus his or her insurance is not sufficient to make the injured party whole. And so for practical fairness reasons, many plans, I can tell you, as an officer of the court, specifically carve out recoveries from underinsured and uninsured motorist coverage. And we explain in the blue brief on pages 34 and 35 why that's the most sensible reading of this document. It talks about damages for the responsible appropriate party. The plain meaning of that language is tortfeasor. Now, this takes us to the SPD issue, which really was, I was very surprised to hear the colloquy that went on when I was sitting, where I heard things like, well, in this case, the SPD is the plan. That's shocking to me, because on the second page of the SPD, it says, and I quote, in the event of any discrepancy between this SPD and the official plan document, the plan document shall govern. The second thing that shocked me was reference to Montanil, because that's a case that I argued a month ago and where I have a pending cert petition before the Supreme Court. And the reason I was surprised is, Montanil has entirely different facts. In Montanil, there was only a summary plan description. Now, I will concede I attempted to argue, unsuccessfully, that the summary plan description terms could not be enforced, but losing that argument in the Eleventh Circuit, let's assume that that position becomes the law of the land, it has no relevance here when there clearly is another document. And this is very important, because we can malign the new case document as a survey, as a questionnaire, all we want, but the fundamental reasoning of the Cigna case explains the problem with Humana's position. The fundamental reasoning of Cigna is that terms of a summary are not terms of the plan, because in many instances, the summary is not drafted by the plan sponsor or its agent. That's what's happening here. The plan sponsor sets the terms of the deal. If you have a third party, who, for their own self-interested reasons, and we heard it in the discussion, very candidly, they have an economic interest, rewrites the plan, that's precisely what Cigna... But your clients sign the SPD or publish it or adopt it? May I answer that? I know our time is up. They did eventually, and that's actually in our favor. It was not until January of 2013. So during the entire period of time, from when my client was injured until January, the only document that existed was this document that they've maligned. The previous SPD. That was signed, but that was before this incident. It doesn't have any legal significance. You can't have it both ways, that either it's retroactive to the date when it's accepted by your client, or if it's not in effect, then the other continues. You can't be without an SPD. But I don't agree with that. I think you need to have an SPD, but it doesn't mean that you have a noncompliant circumstance. I think that's unfortunately what happened here. There was a period with no SPD, because the prior SPD did not summarize the changes that everyone agrees occurred in 2011 to the new case document. Okay, Mr. Trish, thank you.